

JUDGE TORRES

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PHOENIX ENTERTAINMENT PARTNERS,
LLC as successor in interest to SLEP-TONE
ENTERTAINMENT CORPORATION
     Plaintiff,

     v.

SING SING BELL INC., 6 SAINT MARKS
INC., WEST LA INC., L A K INC, 54 EAST
ENTERTAINMENT, INC., 812
BROADWAY INC., M & S MUSIC STUDIO
INC., 3D MUSIC STUDIO INC., SINGSING
MEDIA INC., KARAOKE CHAMP INC., OK
SOON LEE, AE SOOK CHOI, SUN CHUL
LIM, TOSHIHIKO KIDA, JIN E AN, HYE
KYUNG HAN, JOHN DOE.

     Defendants.

CASE NO.



## COMPLAINT

The Plaintiff, Phoenix Entertainment Partners, LLC ("PEP"), by its counsel, hereby sues

Defendants Sing Sing Bell Inc., 6 Saint Marks Inc., West LA Inc., L A K INC, 54 East

Entertainment, Inc., 812 Broadway Inc., Singsing Media Inc., Karaoke Champ Inc., Ok Soon

Lee, Ae Sook Choi, Sun Chul Lim, Jin E An, Toshihiko Kida, Hye Kyung Han and alleges as

follows:

## JURISDICTION AND VENUE

1.     This is an action for trademark infringement and unfair competition arising

under 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter

of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of

the United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.      This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because each named corporate Defendant is a New York business entity with principal places of business within the State and the United States District Court for the Southern District of New York and each named individual, upon information and belief, resides in this District.

5.      This Court has personal jurisdiction over each Defendant. 6 Saint Marks Inc., West LA Inc., L A K INC, 54 East Entertainment, Inc., 812 Broadway Inc., Sing Sing Bell Inc., M & S Music Studio Inc. and 3D Music Studio Inc. (collectively the "the Service Defendants") are all New York business entities with a principal place of business in this State and federal judicial district and conducts significant business in this District.  Singsing Media Inc. and Karaoke Champ Inc. (collectively the "Retail Defendants") are all New York business entities with a principal place of business in this State and federal judicial district and conducts significant business here.  Ok Soon Lee, Ae Sook Choi, Sun Chul Lim, Hye Kyung Han and Toshihiko Kida (collectively the "Individual Defendants") are subject to jurisdiction based upon their ownership, operation and control of the corporate defendants and their related activity in this State and federal judicial district.

**THE PLAINTIFF**

6.     Plaintiff PEP is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7.     Upon information and belief, 6 Saint Marks Inc. is a New York corporation that operates a commercial establishment known as "Karaoke St. Marks" 6 St. Marks Place in New York, New York where karaoke entertainment is provided. Upon information and belief, Defendant, 6 Saint Marks Inc. is owned and operated by Ae Sook Choi and Sun Chul Lim, also named as Defendants.

8.     Upon information and belief, West LA Inc. is a New York corporation that operates a commercial establishment known as "Karaoke Boho West" 186 West 4th Street in New York, New York where karaoke entertainment is provided. Upon information and belief, West LA Inc., is owned and operated by Ok Soon Lee, also named as a Defendant.

9.     Upon information and belief, L A K Inc. is a New York corporation that operates a commercial establishment known as "Sing Sing St. Marks" at 9 St. Marks Place in New York, New York where karaoke entertainment is provided. Upon information and belief, L A K Inc. is owned and operated by Ok Soon Lee and Toshihiko Kida, also named as Defendants.

10.     Upon information and belief, 54 East Entertainment, Inc. is a New York corporation that operates a commercial establishment known as "Karaoke Nemo" at 54 East in New York, New York where karaoke entertainment is provided. Upon information and belief, 54 East Entertainment, Inc. is owned and operated by Ae Sook Choi, named as a Defendant.

11.     Upon information and belief, 812 Broadway Inc. is a New York corporation that operates a commercial establishment known as "Karaoke Boho Orchard St." at 196 Orchard Street in New York, New York where karaoke entertainment is provided. Upon information and

belief, 812 Broadway Inc. is owned and operated by Ae Sook Choi, named as a Defendant.

12.     Upon information and belief, Sing Sing Bell Inc. is a New York corporation that operates a commercial establishment known as "Christmas Karaoke" at 4729 Bell Boulevard in Bayside, New York where karaoke entertainment is provided. Upon information and belief, Sing Sing Bell Inc. is owned by Jin E An, named as a Defendant.  Under information and belief, an entity under the name "Modu Moa Inc.," which operated a karaoke establishment at the same address as Christmas Karaoke under the name "Karaoke Moa" and is believed to have had the same management and ownership as Sing Sing Bell Inc. and other defendants in this matter, was sued by PEP's predecessor, Slep-Tone Entertainment Corporation ("Slep-Tone"), for trademark infringement of the same trademarks in 2011 in this court.[1]

13.     Upon information and belief, M & S Music Studio Inc. is a New York corporation that operates a commercial establishment known as "Gagopa Karaoke" at 28 West 32nd Street (Third Floor) in New York, New York where karaoke entertainment is provided. Upon information and belief, M & S Music Studio Inc. is owned by Hye Kyung Han, named as a Defendant.

14.     Upon information and belief, 3D Music Studio Inc. is a New York corporation that operates a commercial establishment known as "Karaoke 32" at 32 West 32nd Street in New York, New York where karaoke entertainment is provided. Upon information and belief, 3D Music Studio Inc. is owned by Hye Kyung Han, named as a Defendant.

15.     Singsing Media Inc. ("SingSing Media") is a New York corporation. SingSing Media is owned by John Doe, named as a Defendant.

16.     Karaoke Champ Inc. ("Karaoke Champ") is a New York Corporation.   Upon

---

[1] *See* Slep-Tone Entertainment Corporation v Karaoke Moa, 7:11-cv-04656-VB. Please note, for reasons unrelated to the matter at hand, the lawsuit was voluntarily dismissed by plaintiff Slep-Tone.

information and belief, Karaoke Champ is owned and operated by Toshihiko Kida, named as a Defendant.

## FACTS

### *Karaoke and PEP Background Facts*

17.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

18.     The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

19.     Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

20.     Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

21.     The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

22.     PEP is the owner of SOUND CHOICE ("SOUND CHOICE"), a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

23.     PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

24.     Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

25.     SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

26.     The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

27.     SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

28.     Slep-Tone and its successor PEP have released their karaoke tracks for commercial users only on compact discs[2] and not on any other form of carrier (such as computer hard drives or through internet downloads).

29.     Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

---

[2] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

30.     In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

31.     In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

32.     The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

33.     Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

34.     Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

35.     Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

36.     In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

37.     That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

38.     That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

39.     For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

40.     The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

41.     The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

42.     Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

43.     This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

44.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of

karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

45.   None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

46.   Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

*THE RIGHTS OF THE PLAINTIFF*

47.   PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

48.   PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

49.   PEP and its predecessor have, for the entire time its marks identified above ("the SOUND CHOICE Marks") have been federally registered, provided the public, including the Defendants with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

50.     PEP is the owner of distinctive and protectable trade dress associated with its graphical displays (the "Trade Dress"). This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the SOUND CHOICE Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

51.     PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

52.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

53.     The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by the Service Defendants are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the SOUND CHOICE Marks are also displayed.

54.     The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

55.     No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

*ACTIVITIES OF THE SERVICE DEFENDANTS*

56.     The Service Defendants, through or at the direction of the Individual Defendants, provide karaoke services in their venues located throughout the New York City area.

57.     Upon information and belief, in order to provide services, rather than using original and authentic karaoke discs to perform their karaoke services, the Service Defendants rely upon one or more computer hard drives that store files representing duplicate karaoke accompaniment tracks.

58.     Upon information and belief, the Service Defendants rely upon multiple computer hard drives that are substantially identical in content.

59.     Upon information and belief, the Service Defendants created, or directed another to create, or otherwise acquired from a third party, including the Retail Defendants, the files that are stored on their computer hard drives.

60.     Upon information and belief, the Service Defendants do not maintain a 1:1 correspondence relationship between their hard drives and original discs, if any discs, it has lawfully acquired.

61.     Neither PEP nor Slep-Tone authorized, caused, controlled, or knew about the creation of the files stored on the Service Defendants' computer hard drives at the time those files were so stored.

62.     Upon information and belief, rather, the files were created by or at the behest of the Service Defendants, or by the Retail Defendants.  The party who created the files is the "origin" of the files for purposes of the Trademark Act.

63.     Many of the files stored on the Service Defendants' computer hard drives are representative of karaoke tracks originally created by Slep-Tone, PEP's predecessor, and are marked with the SOUND CHOICE Marks.

64.     When played as intended using appropriate software, those duplicative files cause the SOUND CHOICE Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

65.     A patron or unwitting customer of the Service Defendants, when confronted with the display of the SOUND CHOICE Marks and the Trade Dress at one of Defendants' establishments, is likely to be confused into believing, falsely, that Slep-Tone or PEP created the track(s) displayed and in use or authorized their creation.

66.     Defendants' use of the computer files representative of karaoke accompaniment tracks is commercial in nature because it is paid to provide access to and play those computer files and tracks at their establishment(s).

67.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Defendants' are compensated and which inures to their benefit.

68.     Upon information and belief, Defendants' piracy of accompaniment tracks is not limited to PEP's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

### ACTIVITIES OF THE RETAIL DEFENDANTS

69.     The Retail Defendants commercially offer karaoke products and related services. These include sales of karaoke systems that contain pre-installed karaoke tracks; rental of equipment to stage karaoke-themed events and management and consultation services for running a karaoke business.[3]

---

[3] SingSing Media's website: www.singsingmedia.com (last visited May 4, 2015)
Karaoke Champ's website: www.karaokechamp.com/faq (last visited May 4, 2015)

70.    Upon information and belief, SingSing Media offers karaoke system rental services under a brand called "Playbox Karaoke."[4]

71.    According to its website, Karaoke Champ has been renting karaoke systems since 1995.[5]  For sales of equipment and starting a karaoke bar, the FAQ on the Karaoke Champ website asks customers to contact them directly.[6]  Karaoke Champ does not disclose how many total songs are currently available from them.[7]  Karaoke Champ does list over 50 bars and restaurants within New York City that have Karaoke Champ systems installed.[8]   In Karaoke Champ's gallery of pictures displaying events featuring their equipment, one photograph depicts a wedding reception where the bride and groom appear to be singing a SOUND CHOICE accompaniment track.[9]

72.    SingSing Media's website gives brief summary of the different types of karaoke system configurations that it sells to its customers.[10]  For bars that will have a single karaoke system, the songs are stored digitally on a player that is attached to the monitor which shows the corresponding lyrics. For "karaoke businesses with private rooms," either each room has a local system that stores the songs that are played on the monitor, or the songs are hosted on a centralized server which each system remotely connecting to the server.  Upon information and belief, SingSing Media does not sell sets of SOUND CHOICE CD+Gs in connection with the karaoke systems that it offers.

---

[4] Playbox Karaoke's website: www.playboxkaraoke.com (last visited May 4, 2015)

[5] www.karaokechamp.com (last visited May 4, 2015)

[6] www.karaokechamp.com/faq (last visited May 4, 2015)

[7] It should be noted what appears to be an out of date page from the Karaoke Champ website lists multiple options for number of songs when renting a Karaoke Champ system, with the maximum number of songs available with a Karaoke Champ system being over 25,000.  *See* www.karaokechamp.com/order2/order1.php (last visited May 4, 2015)

[8] www.karaokechamp.com/event-venues-karaoke-rental/ (last visited May 4, 2015)

[9] www.karaokechamp.com/sp/gallery/008/ (last visited May 4, 2015)

[10] www.singsingmedia.com/singsing-karaoke/ (last visited May 4, 2015)

73.     The SingSing Media website lists a number of karaoke bars as "clients" which are located across the United States of America.[11]  There are 9 venues locations in New York City, several of which are the Service Defendants in the action.  The website also specifies with each client which of the following services they provide to each of their clients: a) consulting, b) system & equipment, c) design & construction, and d) management. While some of the clients listed on this page do not utilize all of these services, all of the Service Defendants (except Gagopa Karaoke and Karaoke 32 which only include consulting and system & equipment) are listed as using all 4 types of SingSing Media's services.

74.     SingSing Media's website also claims to have the largest karaoke library in the United States – "100,000 songs in 15 different languages with more than 100 new songs each month" added to their library.[12] However, SingSing Media's website does not address how these songs are produced or otherwise acquired.

75.     Upon information and belief, both SingSing Media and Karaoke Champ have rented out and sold karaoke systems containing SOUND CHOICE-branded karaoke accompaniment tracks.

76.     Upon information and belief, in order to be able to manufacture and distribute digital karaoke systems, the Retail Defendants have stored in excess of 100,000 karaoke accompaniment tracks in a digitized format upon one or more master computer hard drives.

77.     Upon information and belief, the Retail Defendants have obtained most or all of the karaoke accompaniment tracks they have stored on their master computer hard drives through illicit means, such as by purchasing tracks or hard drives from other sellers, by downloading tracks from illegal file-sharing websites or through web based applications, or by

---

[11] www.singsingmedia.com/clients (last visited May 4, 2015)
[12] www.singsingmedia.com/songsearch (last visited May 4, 2015)

shifting tracks from original discs to the master computer hard drives. From these digitized versions of the karaoke accompaniment tracks contained on their master computer hard drives, the Retail Defendants produce bitwise duplicate copies of the files on new hard drives for their customers, including the encoding which represents the marking of the SOUND CHOICE Marks upon the tracks and the SOUND CHOICE Trade Dress.

78.    Because Retail Defendants directed or otherwise caused the creation of the computer files on the new hard drives, for all intents and purposes, they are the manufacturers of the computer files contained in the digital karaoke systems that they rent and sell to their customers.

79.    Neither PEP nor Slep-Tone has never licensed, authorized, or otherwise permitted SingSing Media, Karaoke Champ, or anyone else to duplicate the SOUND CHOICE Trade Dress or otherwise associate the SOUND CHOICE Marks with computer files representing karaoke accompaniment tracks for the purpose of transferring those to a third party.

80.    Accordingly, the Retail Defendants conduct in creating these tracks is without authority and constitutes counterfeiting.

*Connections Between Service, Retail and Individual Defendants*

81.    There are significant relationships between Service, Retail and Individual Defendants in this action.

82.    The websites of many of the Service Defendants indicate that they have a relationship with Retail Defendant SingSing Media,[13] consistent with the clients listed on the SingSing Media website.[14]

---

[13] www.karaokeboho.com ("site designed and marketed by Sing Sing Media") (last visited May 4, 2015) www.nemonyc.com/ ("Managed by Sing Sing Media") (last visited May 4, 2015) www.karaokestmarks.com/ ("Powered by Sing Sing Media, Inc.") (last visited May 4, 2015) www.karaokexmas.com/ ("Powered by Sing Sing Media, Inc.")(last visited May 4, 2015)

83. While SingSing Media lists Retail Defendants Sing Sing Ave A and Sing Sing St. Marks as it clients, the website for those Retail Defendants indicates that their song database is from Karaoke Champ.[15]

84. Retail Defendant SingSing Media, whose owner is unknown and its "Playbox Karaoke" brand, list their business address as 54 East 13th Street, New York, NY, 10003, on their respective websites,[16] which is the same address as Service Defendant Karaoke Nemo. The original registrant of the Playbox Karaoke website in 2013 is listed as "Yun Sub An" and has the same street address as Service Defendant Christmas Karaoke.[17] The SingSing Media website was registered by "Yunsub An" in 2005.[18] Yun Sub An also appears to have registered the domain for Service Defendant Karaoke St Marks on behalf of SingSing Media.[19] Upon information and belief, Yun Sub An is the brother of Individual Defendant Jin E An, owner of Christmas Karaoke. The website for Christmas Karaoke was also registered by SingSing Media.[20]

85. Defendant Kida is believed to be the sole owner of Retail Defendant Karaoke Champ and also co-owner of Sing Sing St. Marks.

86. Neither PEP nor Slep-Tone authorized any of the Defendants to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks or the Trade Dress.

87. As such, the placement of the SOUND CHOICE Marks and the Trade Dress upon Defendants self-created computer files is a false designation of the origin of those computer files.

---

[14] www.singsingmedia.com/clients (last visited May 4, 2015)
[15] www.karaokesingsing.com/songlist (last visited May 4, 2015)
[16] www.singsingmedia.com (last visited May 4, 2015); www.playboxkaraoke.com (last visited May 4, 2015)
[17] www.whois.com/whois/playboxkaraoke.com (last visited May 4, 2015)
[18] www.whois.com/whois/singsingmedia.com (last visited May 4, 2015)
[19] www.whois.com/whois/karaokestmarks.com (last visited May 4, 2015)
[20] www.whois.com/whois/karaokexmas.com (last visited May 4, 2015)

88.     At all times relevant to the causes of action stated herein, Defendants have known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks and/or the Trade Dress is not authorized.

## DAMAGES

89.     The Defendants' unauthorized use of the PEP's trademarks has damaged PEP.

90.     Defendants' principals have damaged PEP in an amount to be proven at trial but not less than $25,000 for each karaoke system they own or operate and which contains karaoke tracks that infringe the SOUND CHOICE Marks as detailed above, based upon their foregone purchases of original media.

91.     Defendants have also enjoyed years of revenues attributable in substantial part to their use of Sound-Choice-branded karaoke tracks to provide karaoke shows for money.

92.     Defendants' illicit activities have also allowed them to compete unfairly against PEP's legitimate customers by lowering their cost of doing business through piracy of the music materials they use.

93.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Defendants operate by helping to crowd higher-cost but legitimate operators out of the market.

94.     The Defendants' acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

## FIRST CLAIM FOR RELIEF
### *TRADEMARK AND TRADE DRESS INFRINGEMENT UNDER 15 U.S.C. § 1114*
### (Against All Defendants)

95.   PEP repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

96.   The Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

97.   Use of the SOUND CHOICE Marks and the Trade Dress by the Service and Individual Defendants was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

98.   Neither PEP nor Slep-Tone licensed any Service Defendant, Retail Defendant, or Individual Defendant to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the SOUND CHOICE Marks or the Trade Dress in connection with the provision of their services.

99.   Use of the SOUND CHOICE Marks and the Trade Dress by the Defendants in this manner is likely to cause confusion, or to cause mistake, or to deceive their customers and patrons into believing that their services are being provided with the authorization of PEP and that their music libraries contain bona fide SOUND CHOICE accompaniment tracks.

100.   The acts of the Defendants were willful, knowing, and intentional.

101.   PEP has been damaged by these infringing activities.

102.   Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## SECOND CLAIM FOR RELIEF
### *UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)*
#### (Against All Defendants)

103.   PEP repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

104.   On each occasion when they caused or permitted an unauthorized copy and/or duplicate of a SOUND CHOICE-branded accompaniment track to be played during a karaoke show at their establishment, the SOUND CHOICE Marks and the Trade Dress were displayed in connection with the Defendants' karaoke services.

105.   The display of the SOUND CHOICE Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone or PEP manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendants' services and commercial activities.

106.   The display of the SOUND CHOICE Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone or PEP and purchased or otherwise licensed by the Defendants.

107.   The Service and Individual Defendants' use of the SOUND CHOICE Marks and Trade Dress in this fashion or in a more appropriate fashion would have inured to the benefit of PEP if the Defendants had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

108.     Because PEP has been denied this revenue, it has been damaged by the Defendants' uses.

109.     On each occasion when the Defendants caused or permitted an accompaniment track pirated from a manufacturer to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the Defendants' karaoke services.

110.     Upon information and belief, the Defendants' use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact Defendants or an upstream but unauthorized provider of the track was the origin of that track.

111.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that the Defendants acquired in a legitimate manner.

112.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by the Defendants.

113.     The Defendants' use of the false designations of origin in this fashion damages PEP by enabling the Defendants to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers, can provide or obtain them.

114.     The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

115.     Because PEP has been denied this revenue, it has been damaged by the Defendants' false designations of origin relating to other manufacturers.

116.     Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

### THIRD CLAIM FOR RELIEF
*TRADEMARK COUNTERFEITING UNDER 15 U.S.C. § 1114*
**(Against Retail Defendants)**

117.     PEP repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

118.     The Retail Defendants, without authorization from either PEP or Slep-Tone, has used spurious designations that are identical with, or substantially indistinguishable from, the Slep-Tone Marks in interstate commerce through their sale and rental of karaoke-related products.

119.     The foregoing acts of the Retail Defendants are intended to cause, have caused, and are likely to continue to cause confusion or mistake, or to deceive Retail Defendants' customers into believing that they are acquiring authorized copies of SOUND CHOICE products and that they were being provided with the authorization of PEP.

120.     The Retail Defendants' acts as aforesaid constitute trademark counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

### FORTH CLAIM FOR RELIEF

### UNFAIR AND DECEPTIVE TRADE PRACTICE UNDER NEW YORK GENERAL BUSINESS LAW § 349
**(Against All Defendants)**

121.    Slep-Tone repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

122.    On each occasion when the Service Defendants caused a SOUND CHOICE recording to be played during a karaoke show, or the Retail Defendants sold or rented or offered for sale or rent karaoke products containing SOUND CHOICE recordings, the Defendants displayed the SOUND CHOICE Marks.

123.    The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the Plaintiff sponsored or approved the Defendants' services and commercial activities.

124.    The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Plaintiff or its licensee(s) and legally purchased by the Retail Defendants or the Service Defendants.

125.    Defendants conduct constitutes unfair and deceptive acts or practices in violation of N.Y.G.B.L. § 349.

### <u>FIFTH CLAIM FOR RELIEF</u>
### UNFAIR COMPETITION UNDER THE COMMON LAW OF NEW YORK
**(Against All Defendants)**

126.    This claim arises under the common law of the State of New York relating to trademark infringement and unfair competition. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of

unfair competition joined with a substantial and related claim under the Trademark Laws of the United States, and pursuant to 28 U.S.C. § 1367 under the doctrine of supplemental jurisdiction. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

127.    PEP repeats and incorporates by reference herein its allegations contained in foregoing paragraphs of this Complaint.

128.    As fully set forth above, the SOUND CHOICE Marks are indicative of origin, relationship, sponsorship, and/or association with Plaintiff. The purchasing public is likely to attribute all Defendants' use of the SOUND CHOICE Marks as a source of authorization, endorsement, and/or sponsorship of Defendants' services and use of these marks.

129.    Upon information and belief, Defendants' have intentionally appropriated the SOUND CHOICE Marks with the intent of causing confusion, mistake, and deception as to their relationship with PEP and with the intent to palm themselves off as being authorized by, sponsored by, approved, by or licensed by PEP and, as such Defendants have committed trademark infringement and unfair competition under the common law of this state.

## PRAYER FOR RELIEF FOR ALL COUNTS

WHEREFORE, Plaintiff PEP prays for judgment against each of the Defendants, and that the Court:

A.    Find that each of the Defendants has committed acts of infringement, including but not limited to counterfeiting, of the federally registered SOUND CHOICE Marks and of the Trade Dress;

B.    Find that each of the Defendants has engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.     Enter judgment against each of the Defendants and in favor of PEP on all applicable counts;

D.     Find the that Defendants' activities were in all respects conducted willfully and for profit;

E.     Award to PEP the Defendants' profits and the damages sustained by PEP because of the Defendants' conduct in infringing the SOUND CHOICE Marks, the SOUND CHOICE Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each karaoke system operated by each of the Defendants and not less than $75,000 for each establishment in which the infringement occurred;

F.     Award to PEP the Defendants' profits and the damages sustained by PEP because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), jointly and severally based upon the partnered and collusive conduct of the Defendants;

G.     Award to PEP treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

H.     Order all computer disks, drives, or other media belonging to any of the Defendants, which media contain counterfeits of Slep-Tone's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.     Grant PEP preliminary and permanent injunctive relief against further infringement of the SOUND CHOICE Marks by the Defendants;

J.     Grant PEP preliminary and permanent injunctive relief against further false designations of origin by the Defendants with respect to words, names, and symbols associated with other manufacturers;

K.    Award PEP its costs of suit and attorney's fees, to the extent not awarded above;

and

L.    Grant PEP such other and further relief as justice may require.

Respectfully submitted this the 5th day of May, 2015.

/s/ Philip Z. Kimball
Philip Z. Kimball (PK-1470)
Philip Z. Kimball PLLC
111 Lawrence Street, Unit 6H
Brooklyn, NY 11201
Phone: (646) 801-8363
Fax: (212) 358-2517
Email: pzkimball@pzklaw.com

Vivek Jayaram (*pro hac vice* pending)
Jayaram Law Group, Ltd.
33 N. LaSalle Street, Suite 2900
Chicago, Illinois 60602
Phone: (312) 454-2859
Fax: (312) 551-0322
Email: vivek@jayaramlaw.com

**Attorneys for Plaintiff Phoenix
Entertainment Partners, LLC**